**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Hector Guzman RIVERA,
Defendant, Appellant.**

**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**Rafael VELASQUEZ–MARQUEZ,
Defendant, Appellant.**

**Nos. 93–2101, 93–2102.**

United States Court of Appeals,
First Circuit.

Oct. 17, 1995.

---

1. But see Justice Ginsburg's views in her concurring opinion in *Albright v. Oliver,* —— U.S. ——, —— –– ——, 114 S.Ct. 807, 814–817, 127 L.Ed.2d 114 (1994).

Rachel Brill, Old San Juan, on brief for appellant Hector Guzman Rivera.

Luis A. Amoros, Rio Piedras, on brief for appellant Rafael Velasquez–Marquez.

Jose A. Quiles–Espinosa, Senior Litigation Counsel, W. Stephen Muldrow, Assistant United States Attorney, and Guillermo Gill, United States Attorney, on brief for appellee.

Before BOUDIN, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

ALDRICH, Senior Circuit Judge.

Hector Guzman Rivera (Guzman) and Rafael Velasquez Marquez (Velasquez) were indicted on December 9, 1992 for, inter alia,

aiding and abetting each other in 1) the possession with intent to distribute approximately two-eighths of a kilogram of heroin, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and 2) using firearms in relation to a drug trafficking offense. 18 U.S.C. §§ 924(c) and 2. Guzman, found guilty by a jury on both counts, appeals, alleging various errors at his trial and from the court's imposition of a fine. Velasquez, who pleaded guilty, complains only of his fine. We affirm.

So far as the trial is concerned, this is a typical case where appellate counsel is able to find nothing but matters so apparently proper on their face as to have invoked no objection at the time. In fact there was no error, let alone the plain error that Guzman must now demonstrate. F.R.Crim.P. 52(b). *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (rule 52(b) authorizes courts of appeal to correct only "particularly egregious errors" that seriously undermine "fairness, integrity or public reputation of judicial proceedings"); *United States v. Taylor*, 54 F.3d 967, 973 (1st Cir.1995) (same).

On the evening of December 3, 1992, Guzman arrived at the Carib Inn in San Juan driving a dark-colored automobile. A confidential informant was in the front seat, and Velasquez in the back. Velasquez proved to possess two-eighths of a kilogram of heroin, which he was planning to exchange with Moran, an undercover DEA agent, for $50,000. The evidence, post, warranted a finding that Guzman had a revolver. As expected, the auto was met by Moran, who put his head in the window and asked if they had the heroin. Defendants simultaneously said yes—the clearest evidence of a conspiracy relationship. The court admitted tapes of conversations between Velasquez and Moran arranging for the heroin transaction, recorded only hours before it took place. Guzman now complains of this.

■ Hearsay statements are admissible against a defendant when it is more likely than not that he was a coconspirator of the speaker, that the conspiracy existed at the time the statements were made, and that

they were made in furtherance of it. *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). *See* F.R.Evid. 801(d)(2)(E). There is no requirement that the indictment charge conspiracy to find such statements admissible. *United States v. Ortiz*, 966 F.2d 707, 714 (1st Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993). While there were some arguable contradictions in the testimony, the fact that Velasquez stated during the taped conversations that the heroin belonged to himself and two partners, that Guzman and another in fact showed up to deliver the heroin very shortly after Velasquez' final conversation cementing the deal with Moran, that he was driving the vehicle to the meeting place Velasquez negotiated during those conversations, that he was armed with a loaded weapon and carried additional ammunition, coupled with the uncontroverted evidence that he responded positively, in concert with Velasquez, when Moran asked if they had the "manteca,"[1] are more than sufficient to convince us no plain error occurred. We do not take the fact that Moran was not expecting Guzman as necessarily meaning that Velasquez was so casual as to seek a driver and additional protection only at the last minute.

■ With respect to Guzman's possession of a firearm, a police officer testified that as he was approaching the parked car after Moran had given the prearranged arrest signal, he saw Guzman draw a revolver from his waist, and then lean forward as if he were placing an object on the floor. While Guzman was placed under arrest, a revolver was found on the driver's side, beneath the foot pedals. Guzman complains that the court denied him early access to the revolver, which might have shown absence of his fingerprints, thereby contradicting his possession. The government's response is twofold: where standard procedures (which we have no occasion to question here) require arresting officers to seize the firearm for their own protection, and later to have the weapon tested to determine whether it was operable, no print examination was performed, and by the time Guzman first sought examination it had been cleaned and thinly coated with a

---

1. The street name for heroin.

preservative for storage. Guzman's own expert conceded that after such treatment no previous fingerprints could have remained. In any event, ultimately granted access to the gun, Guzman had it checked for prints, established the lack of his, and introduced this result at trial. It is clear that these results would have been exactly the same had the court granted Guzman's first request, rendering the court's initial refusal, at most, harmless error. *United States v. Sepulveda,* 15 F.3d 1161, 1182 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

The positive evidence attributing the revolver to Guzman is confirmed by the fact that a "speed loader" that fitted it was found on his person. We understand the seriousness of this offense but are surprised that this claim is made.

■ Next, the court's charge defining "use" of a firearm [2] under section 924(c) was so clearly correct, and the evidence so fitting, that we take little time to expound the law, or repeat the facts. Guzman's contention that the jury could have convicted him for mere possession, not "use," as the statute requires, is groundless, given that the jury specifically asked whether the firearms count required "possession" or "use," and the court then properly instructed it on the statutory meaning. "Use" means to obtain a benefit from the arm's presence in relation to the drug transaction, and does not require discharge or threat with same. *See United States v. Castro–Lara,* 970 F.2d 976, 983–84 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 684 (1993). The sole issue is whether a firearm was "available for use" to Guzman during the drug transaction, *United States v. Hadfield,* 918 F.2d 987, 998 (1st Cir.1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991), a conclusion the evidence abundantly supports. It is scarcely helpful to cite cases from the D.C. Circuit that have been overruled, or a dissent from an early decision in our Circuit long ignored. Counsel has a duty not to make such frivolous contentions. *See* A.B.A.

Model Rules of Professional Conduct, Rules 3.1 and 3.3 (1994 ed.).

■ Next, Guzman now claims error in the court's admitting Moran's testimony that the heroin, agreed to be worth $50,000, might have brought $500,000 at retail after being cut. There is little dispute that such information may aid in proving intent to distribute. *United States v. Miller,* 589 F.2d 1117, 1136 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Pigrum,* 922 F.2d 249, 254 (5th Cir.1991); *United States v. Amaechi,* 991 F.2d 374, 377 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993). DEA agents are especially qualified, and need not be certified as experts, to testify about street value, and counsel can argue reasonable inferences from it. *United States v. Ogbuehi,* 18 F.3d 807, 812 (9th Cir.1994); *see also, United States v. Agyen,* 842 F.2d 203, 205 (8th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2021, 100 L.Ed.2d 608 (1988).

■ Finally, although the Sentencing Guidelines state that the court "shall impose a fine in all cases, except where the appellant establishes that he is unable to pay and is not likely to become able to pay any fine," U.S.S.G. § 5E1.2(a), and the minimum statutory fine was $10,000 for Velasquez and $12,500 for Guzman, U.S.S.G. § 5E1.2(c), neither defendant is thankful that the court reduced each to $5,000. Rather, both claim they should go scot-free. It is true that the presentence reports for both defendants indicated no apparent source of funds, but it is not true that the reports recommended no fine, as defendants claim. Both are healthy individuals with no apparent disabilities. Neither objected to his fine at the time of sentencing, although given an opportunity to do so, and even now they make no attempt to show incapacity to earn. Surely it would be a dangerous precedent to take the argument they were given counsel, and allowed to appeal in forma pauperis, as meeting their bur-

---

**2.** Guzman's contention that the court's reference throughout its instructions to the jury to "firearm," or "weapon" in the singular, as opposed to the indictment's use of "firearms" in the plural, impermissibly altered the indictment requiring reversal, is specious.

den, under § 5E1.2(a), to show they could never earn this relatively modest sum.

*Affirmed.*