**UNITED STATES of America, Appellee,**

v.

**John LiCAUSI, Defendant, Appellant.**

**United States of America, Appellee,**

v.

**James Fogarty, III, Defendant, Appellant.**

---

United States of America, Appellee,

v.

Christopher Durfee f/k/a Christopher Dupre, Defendant, Appellant.

Nos. 97–2013, 97–2014 and 97–2030.

United States Court of Appeals,
First Circuit.

Heard Sept. 15, 1998.
Decided Jan. 27, 1999.

Glenn G. Geiger, Jr. with whom Geiger & Heiser was on brief for appellant James Fogarty, III.

Stephen A. Cherry with whom Wright, Cherry & Callen was on brief for appellant Christopher Durfee.

John H. LaChance with whom Victoria L. Nadel was on brief for appellant John LiCausi.

Donald A. Feith, Assistant United States Attorney, with whom Paul M. Gagnon, United States Attorney, was on brief for appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

ALDRICH, Senior Circuit Judge.

John LiCausi, James Fogarty, III, and Christopher Durfee[1] were convicted in the United States District Court for the District of New Hampshire of multiple offenses in connection with the robbery and attempted robbery of several grocery stores and restaurants. They allege several points of error as they challenge their convictions and sentences. We affirm.

## I. BACKGROUND

### A. *Facts*

We consider the evidence in the light most favorable to the prosecution, *see United States v. Josleyn,* 99 F.3d 1182, 1185 n. 1 (1st Cir.1996), as we determine the basic facts the jury reasonably could have found. We will add to our sketch other facts as they become necessary to the discussion of particular claims of error.

On several occasions in November of 1995, Bernie Subocz and defendants Durfee and Fogarty met at Fogarty's garage in Lawrence, Massachusetts to discuss committing armed robberies of supermarkets. As the meetings continued into December, defendant LiCausi was introduced to the group by Fogarty and participated in the discussions. Subocz also had several robbery-related telephone conversations with Fogarty and Durfee during this time.

Topics of discussion included the division of responsibilities in obtaining necessary equipment. Subocz already owned a scanner for listening in on law enforcement radio transmissions, a frequency guide to use in programming the scanner, and two-way radios for communicating during robberies. LiCausi was to obtain a shotgun, while Subocz would obtain one or two pistols. Fogarty contributed $300 towards the pistol purchase, and Subocz later had his girlfriend, Lori Munroe, buy two nine-millimeter semiautomatic pistols, a Beretta and a Smith & Wesson, and hollow-point ammunition. Subocz later acquired a shotgun and radio frequency guides for several different local areas. Fo-

---

1. Christopher Durfee had had his name legally changed from Dupre to Durfee, but was referred to as Dupre during the proceedings below and in the record. We call him by his current legal name, Durfee, in this opinion.

garty later bought hats, gloves, jumpsuits, and three pairs of rubber boots.

Members of the group soon began seeking out targets. Subocz and Fogarty started things off by robbing a D'Angelo Sandwich Shop in Stoneham, Massachusetts on December 8, 1995. Wearing masks and gloves and carrying the two loaded pistols, they made off with between one hundred and two hundred dollars each. The pair then attempted to rob a supermarket in Ohio on December 17. After casing the market and buying hats and a frequency guide for the area, they entered the store wearing gloves and hats and each concealing a pistol. Subocz initially spoke to the manager regarding a rotten head of lettuce he claimed to have purchased, then pulled his shirt up to his eyes and showed his weapon. On their way to the store safe, however, the manager stopped to speak to an employee, unnerving the robbers and prompting them to leave immediately.

Durfee started participating in actual robberies about a week later. A few days after spending the evening of December 23 with Subocz but failing to find a suitable target, the pair robbed a Burger King in Kittery, Maine after one of the group's meetings. They each carried one of the two pistols, Durfee having "rented" the Smith & Wesson from Fogarty for one or two hundred dollars. They both showed their weapons, and Subocz forced the manager to hand over all of the cash in the office, some $1,400. The pair netted substantially more, some $66,000 in cash, from their next robbery, that of a Vista Foods supermarket in Manchester, New Hampshire on January 3, 1996. Subocz first cased the market a few days before and notified Durfee of its potential. Then, on the designated evening, they hid in a closet next to the manager's office with the two pistols and waited for the store to close. They burst out of the closet, surprising the manager, and threatened him with their weapons. They had him open the safe, then cleaned it out and made their escape.

LiCausi started participating in actual robberies with an attempt on a Market Basket in Woburn, Massachusetts during that January. Subocz, Fogarty, and either Durfee or LiCausi were slated to participate, and Li-Causi ultimately got the call. After one or more of the men had cased the store over the course of several days, all three went there between five and seven o'clock the morning of their attempt. In addition to the standard robbery attire, including masks and gloves, they had the pistols, the scanner, the frequency guide, and the two-way radios. Li-Causi wore a jumpsuit that Fogarty had purchased. They ultimately abandoned their attempt because they feared a newspaper delivery truck parked in front of the store contained a SWAT team or other police officers.

Jason Fournier, an acquaintance of Subocz, Fogarty, and Durfee who had agreed sometime during the previous year to become involved in robberies, then joined LiCausi and Subocz in an attempt on a Star Market in Saugus, Massachusetts in the early morning of February 2. LiCausi again wore a jumpsuit that Fogarty had acquired and carried one of the radios and the Beretta pistol. Fournier wore another jumpsuit and carried the other radio. Subocz carried the shotgun he had acquired. After successfully entering the store, detaining those inside, and finding the safe, they fled empty-handed upon seeing a man walking to an automatic teller machine outside the store. Later that day, the trio robbed a Market Basket in Nashua, New Hampshire, netting approximately $18,000. This time LiCausi wore a jumpsuit and carried Subocz's shotgun, while Fournier carried the Beretta pistol.

Durfee then joined Subocz and Fournier for two attempts on a Market Basket in Portsmouth, New Hampshire. The first, on March 20, involved just the three of them. Subocz carried the shotgun and one of the radios while Durfee carried the Beretta. Fournier stayed outside with the other radio. They abandoned their attempt, however, when the battery in one of the radios died. LiCausi joined them a few days later for a second try. Fournier was to be the lookout again while Durfee and LiCausi would enter the store armed with the shotgun and the Beretta. They left immediately, however, when they saw the manager become alarmed and pick up the phone.

LiCausi was also involved in the next three incidents. He, Fournier, and Subocz made an attempt on a Market Basket in Tewksbury, Massachusetts on April 17. After hiding in a crawl space above the ceiling of the men's restroom, LiCausi and Fournier dropped down wearing their masks and gloves and carrying the Beretta and a BB pistol LiCausi had provided. They went onto the sales floor, found the manager, and almost had the safe open when Subocz warned them over the radio that two people outside were running towards a pay phone. They immediately left the store and drove off with Subocz, then fired several shots at a pursuing vehicle. The next day, LiCausi and Subocz made an attempt on a Market Basket in Warner, New Hampshire. After they stole a car, got dressed, and readied their weapons, they abandoned the attempt when a crowd outside the store failed to disperse and the scanner picked up a transmission about the car they had just stolen. Finally, LiCausi, Subocz, and Fournier attempted to rob a Pic–N–Pay in Portsmouth, New Hampshire on April 24. LiCausi carried the shotgun, Fournier carried the Beretta, and Subocz listened to the scanner and maintained radio contact from the outside. After binding several employees with duct tape, LiCausi and Fournier tried forcing the manager to open the safe. This time, the manager fought back, and Fournier shot and wounded him in the hand. The robbers escaped the struggle but left behind the Beretta pistol and one of the radios. This and other problems, along with diligent investigative work, finally led to the group's undoing.

As these stories indicate, each of the defendants was involved in several aspects of the continuing criminal association among them and others. They also used much of the same equipment in almost all of their robberies. Many times one or more of the persons involved in a particular robbery used equipment that an associate had purchased.

In addition, the defendants and others used many of the same procedures during their robberies and attempts. They often cased their targets, sometimes for several days. Before carrying out an attempt they carefully wiped down all of their equipment, including their two-way radios and weapons, to remove any fingerprints. The robberies often involved three individuals, two of whom entered the target premises wearing masks and gloves and carrying weapons while the third stood lookout outside. In many cases, too, a stolen "drop" car was used for transport to and from the robbery site while a "safe" car waited elsewhere.

Finally, we note that, while each defendant's participation in actual robberies ebbed and flowed over the course of the association, communications and relationships continued among the three defendants and others during that time. For example, after the D'Angelo Sandwich Shop robbery, committed by Subocz and Fogarty, the two spoke by telephone two to three times per week, sometimes daily, and Subocz spoke with Durfee once or twice per week. After Subocz and Durfee robbed the Vista Foods supermarket in Manchester, New Hampshire, Durfee lent some of his share of the proceeds to Fogarty and took a trip to Florida with him. Subocz notified all three defendants when he had successfully acquired a shotgun. Later, when Fournier refused to do anything with LiCausi because he did not know him, Subocz had him speak to Fogarty and Durfee, who both vouched for LiCausi during telephone conversations. Such instances illustrate the extent of these persons' association, both personal and criminal.

### B. *Procedural History*

A federal grand jury sitting in Concord, New Hampshire returned a twenty-seven count superseding indictment against the three defendants on January 8, 1997. Count 1 charged all three with participating in an overarching conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, and the bank robbery statute, 18 U.S.C. § 2113, all in violation of 18 U.S.C. § 371. The remaining twenty-six counts charged one or more of them with separate robberies, attempted robberies, and conspiracies to commit robbery, all in violation of 18 U.S.C. § 1951, possession and interstate transportation of firearms in violation of 18 U.S.C. § 922, use of firearms during crimes of violence in violation of 18 U.S.C. § 924, and interstate

transportation of stolen vehicles in violation of 18 U.S.C. § 2312.

Counts 10, 13, 17, and 20, all charging conspiracy to commit robbery, were dismissed as to all defendants on the government's motion, and Count 9, charging conspiracy to commit the robbery of the Saugus Star Market, was dismissed as to Fogarty but not as to LiCausi. In sum, LiCausi was tried on the count charging an overarching conspiracy, one count of robbery, three counts of attempted robbery, two counts of conspiracy to commit robbery, four counts of using a firearm during a violent crime, and five counts of interstate transportation of a stolen vehicle. Fogarty was tried on the count charging an overarching conspiracy, three counts of conspiracy to commit robbery, one count of possession of firearms by a felon, and one count of transportation of firearms by a felon. Durfee was tried on the count charging an overarching conspiracy, one count of robbery, one count of attempted robbery, two counts of conspiracy to commit robbery, two counts of using a firearm during a violent crime, and one count of interstate transportation of a stolen vehicle.

A jury trial began on April 2, 1997, and the jury returned verdicts on May 5, 1997. LiCausi was convicted on all counts. Fogarty was convicted on the overarching conspiracy count, the firearms counts, and one of the counts charging conspiracy to commit robbery, but was acquitted on the other two counts charging conspiracy to commit robbery. Durfee was convicted on all counts except for one count charging conspiracy to commit robbery.

LiCausi was sentenced to 1,042 months in prison plus three years of supervised release and ordered to pay a $1,600 assessment and $21,206.51 in restitution. Fogarty was sentenced to 387 months in prison plus three years of supervised release and ordered to pay a $250 assessment and $294 in restitution. Durfee was sentenced to 437 months in prison plus three years of supervised release and ordered to pay a $700 assessment and $85,385.35 in restitution. All three defen-

dants filed timely appeals outlining multiple and often overlapping claims of error.

## II. DISCUSSION

### A. *Waived Claims of Error*

■ We briefly mention at the outset those claims that the complaining defendants have not adequately preserved. First, Durfee moved for severance immediately before the government called Matthew O'Brien as a rebuttal witness but not before trial. By failing to raise the issue before trial, he has waived his right to pursue it here. *See* Fed. R.Crim.P. 12(b)(5); *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir.1992).

■ Second, Fogarty claims that venue was not properly established as to the counts charging conspiracy to commit the robbery of the D'Angelo Sandwich Shop in Stoneham, Massachusetts and possession and transportation, respectively, of firearms by a felon. "It is settled beyond peradventure that venue is a personal privilege which can be waived." *United States v. Santiago*, 83 F.3d 20, 24 (1st Cir.1996). Fogarty did not challenge venue on the conspiracy count until his motion for judgment of acquittal, and he challenges venue as to the firearms counts for the first time on appeal. His failure to raise these challenges prior to trial prevents him from raising them now. *See id.* (citing Fed.R.Crim.P. 12(b)(2) (mandating waiver of most defenses that could have been, but were not; raised prior to trial)).

■ Third, LiCausi challenges the sentences he received for his four convictions for using a firearm during a violent crime. *See* 18 U.S.C. § 924(c)(1). He was sentenced under the statute to one five-year term for his first violation and three twenty-year terms for his second and subsequent violations, all to be served consecutively to each other and to the sentences imposed for his other offenses. LiCausi preserved an objection to these sentences based on the proposition that a defendant must have already served the five-year sentence for his first offense before a twenty-year sentence could be imposed.[2] LiCausi abandoned this argu-

---

2. This proposition is, of course, precluded by the Supreme Court's decision in *Deal v. United* *States*, 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), but LiCausi asked that his objection be

ment on appeal, thereby waiving it. *See United States v. Dietz*, 950 F.2d 50, 54 (1st Cir.1991). He argues instead that multiple sentences imposed under § 924(c) in one proceeding, while required to run consecutively to non-§ 924(c) sentences, may run concurrently with each other. The law is clear that a defendant may not raise arguments for the first time on appeal that he did not seasonably address to the trial court. *See id.* at 55 ("A criminal defendant, dissatisfied with the district court's rulings at sentencing yet persuaded that his original arguments lacked merit, cannot switch horses mid-stream in hopes of locating a swifter steed."). LiCausi's claim, then, is dead on arrival.

Having disposed of these contentions, we may now address those that were properly preserved.

### B. *Challenges Relating to the Convictions as to a Single Overarching Conspiracy*

All three defendants claim, first, that the evidence presented at trial was insufficient to prove a single, overarching conspiracy among them and the government's cooperating witnesses. They claim further that, given this alleged variance between the conspiracy charged and the proof at trial, they were prejudiced by the admission of inadmissible hearsay and by evidentiary spillover. Finally, both LiCausi and Fogarty claim that they should not have been sentenced for both conspiracy to violate the laws of the United States in violation of 18 U.S.C. § 371 and conspiracy to commit robbery in violation of 18 U.S.C. § 1951. Addressing each one of these claims in turn, we find no reason to disturb the judge's rulings or the jury's verdict.

■■■ Whether a single conspiracy or a multiple conspiracy exists is, of course, a question of fact for the jury. *See United States v. Drougas*, 748 F.2d 8, 17 (1st Cir. 1984). In assessing a sufficiency-of-the-evidence challenge to such a finding, we credit both direct and circumstantial evidence, resolve all evidentiary conflicts and credibility questions in the prosecution's favor, and

choose from among competing inferences the one best fitting the prosecution's theory of guilt. *See United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995). To uphold a conviction, we "need not believe that no verdict other than a guilty verdict could sensibly·be reached, but must only satisfy [ourselves] that the guilty verdict finds support in 'a plausible rendition of the record.'" *United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993) (quoting *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992)).

■■■ In reviewing a jury's finding that a single conspiracy existed, we consider specifically such factors as the commonality *vel non* of the nature, motive, design, implementation, and logistics of the illegal activities as well as the scope of coconspirator involvement. *See United States v. Randazzo*, 80 F.3d 623, 629 (1st Cir.1996). While these factors inform our inquiry, however, we will leave undisturbed the jury's finding so long as the totality of the evidence sufficiently demonstrates "that all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or overall plan." *Drougas*, 748 F.2d at 17. The government need not prove that each defendant participated in every transaction necessary to fulfill the aim of the overall agreement, *see id.*, nor must it prove that each defendant knew every detail of the conspiracy or knew or had contact with every other coconspirator. *See United States v. Mena–Robles*, 4 F.3d 1026, 1033 (1st Cir.1993). We think that the facts outlined above, which include meetings involving all of the defendants and relating to supermarket robberies, shared equipment contributed by different members of the group, common participants and similar logistical arrangements, and close contact among members of the group during the life of their association, adequately support the jury's finding that a common goal or overall plan existed.

■■■ As for individual defendants and their culpability *vel non* for involvement in that overarching conspiracy, we start with the principle that a defendant who has committed only one or a few of the crimes neces-

---

preserved "in the event that is ever reconsidered and reversed by the Supreme Court".

sary to fulfill the aim of a multiple-crime conspiracy can nevertheless be convicted for that conspiracy if the evidence supports a finding that he had "knowledge or foresight of the conspiracy's multiplicity of objectives." *United States v. Morrow*, 39 F.3d 1228, 1234 (1st Cir.1994) (emphasis omitted). This is so "even if the conspiracy is open-ended (e.g., a conspiracy to rob banks) and the specifics of the future crimes (e.g., which banks) is undetermined or at least unknown to the defendant." *Id.* A defendant can be found guilty of a narrower conspiracy only if he agreed with others to commit one or a few crimes and had no knowledge or foresight of the conspiracy's broader scope. *See id.* We have no trouble finding here that each of the defendants had knowledge or foresight of the conspiracy's multiplicity of objectives. Indeed, the association formed here appears very much like the hypothetical one described in *Morrow*: an open-ended conspiracy where the specifics of future crimes were undetermined or unknown to particular defendants. *See id.* Thus, the jury properly found beyond a reasonable doubt that all three defendants and others formed a single, overarching conspiracy.

 We may therefore spend very little time on defendants' other claims regarding admissibility of evidence offered to prove the individual crimes. As to the hearsay testimony, "[h]earsay statements are admissible against a defendant when it is more likely than not that he was a coconspirator of the speaker, that the conspiracy existed at the time the statements were made, and that they were made in furtherance of it." *United States v. Rivera*, 68 F.3d 5, 7 (1st Cir. 1995); *see also* Fed.R.Evid. 801(d)(2). Since the overarching conspiracy was adequately proven at trial, the testimony as to statements made regarding the individual robberies was properly admitted. As to the prejudicial spillover claim, the evidence presented was relevant not only to prove that the individual robberies, attempts, and associated crimes took place, but also to the issue of whether an overall conspiracy existed. *See*

*United States v. Gomez–Pabon*, 911 F.2d 847, 853 (1st Cir.1990) (holding that proof of a conspiracy may consist of circumstantial evidence and inferences from surrounding circumstances). It was therefore relevant to all of the defendants, and "[w]here evidence featuring one defendant is independently admissible against a codefendant, the latter cannot convincingly complain of an improper spillover effect." *United States v. O'Bryant*, 998 F.2d 21, 26 (1st Cir.1993). Moreover, the jury acquitted Durfee on one count and Fogarty on two counts, including one on which Durfee was convicted, indicating to us that the jury was able to assess the guilt of each defendant on each count separately.

 Nor do we see any merit in LiCausi's and Fogarty's claims that imposing separate, consecutive sentences for the overarching conspiracy and the individual Hobbs Act conspiracies violates Double Jeopardy principles.[3] Under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and its progeny, "[a] *single act* may constitute two different offenses for double jeopardy purposes so long as two different statutes were violated and each requires an element that the other does not." *United States v. Claudio*, 44 F.3d 10, 13 (1st Cir. 1995). This is true of conspiracy as well as other crimes. *See id.* (citing *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)). The test is satisfied here. The Hobbs Act, 18 U.S.C. § 1951, requires proof that the objective of the conspiracy was obstruction of the flow of commerce or an article in commerce. Such proof is not necessary under the general conspiracy provision, 18 U.S.C. § 371. Section 371 requires proof of an overt act in furtherance of the conspiracy, an element that the government need not prove to establish a Hobbs Act conspiracy. Thus, the charged conspiracies are two separate offenses and can be punished as such.

### C. Sufficiency of the Evidence as to Durfee's Other Convictions

██ In addition to claiming that the government failed to prove a single overarching

---

3. Fogarty raised this issue in his sentencing memorandum, while LiCausi raises it for the first time on appeal. We review LiCausi's claim,

then, for plain error only. *See United States v. Kayne*, 90 F.3d 7, 10 (1st Cir.1996).

conspiracy, Durfee has launched a sufficiency-of-the-evidence attack on the rest of his convictions. Durfee was convicted of conspiring to commit, actually committing, and using a firearm in connection with the January 3 robbery of Vista Foods in Manchester, New Hampshire, attempted robbery and use of a firearm in connection with the attempted robbery of the Market Basket in Portsmouth, New Hampshire in March of 1996, and transportation of a stolen Ford Thunderbird from New Hampshire to Vermont.

We believe a rational factfinder could have found Durfee guilty of these crimes beyond a reasonable doubt. Subocz, one of the government's cooperating witnesses, testified at length and in great detail regarding Durfee's role in the Vista Foods robbery, discussing, among other things, where they parked their car, where they hid within the store, what they wore and the weapons they carried, and what they succeeded in taking from the store. In addition, Lori Munroe, Subocz's girlfriend, testified that on that evening she saw Subocz and Durfee come home with a box with money in it. As to the attempted robberies of the Market Basket in Portsmouth, New Hampshire, Subocz testified in detail regarding the participants' roles, the equipment used and clothing worn, which gun Durfee carried, and what caused them to abort their attempts. Fournier testified to many similar details, including Durfee's reluctance to go forward with the first attempt and the theft of a 1996 Ford Thunderbird for the second attempt. Finally, as to the stolen vehicle transportation, both Subocz and Fournier testified that they, LiCausi, and Durfee drove to Vermont and left the Thunderbird in a parking lot there.

■ To support his claim of insufficient evidence, Durfee points out that his convictions rest largely on the testimony of cooperating witnesses. This may be true, but it does not help Durfee's cause. The law is clear that "an accomplice is qualified to testify as long as any agreements he has made with the government are presented to the jury and the 'judge gave complete and correct instructions detailing the special care the jury should take in assessing the testimony.'" *United States v. Hernandez*, 109 F.3d 13, 15 (1st Cir.1997) (quoting *United States v. Ortiz–Arrigoitia*, 996 F.2d 436, 438–39 (1st Cir.1993)). "Indeed, a conviction based solely upon the uncorroborated testimony of an accomplice can be upheld, as long as the jury is properly instructed and the testimony is not incredible as a matter of law." *Id.* (citing *United States v. Andujar*, 49 F.3d 16, 21 (1st Cir.1995)).

Here, the government elicited on direct examination the cooperation arrangements for each witness and introduced into evidence their plea agreements. The cooperating witnesses were extensively cross examined regarding their credibility, and the trial judge carefully instructed the jurors as to the caution they should use in evaluating their testimony. Finally, we do not think that the contradictions Durfee describes amount to the "overwhelming evidence" contemplated in *Hernandez* as necessary to make the witnesses' testimony unbelievable to any rational juror and therefore incredible as a matter of law. We hold, then, that the jury could have concluded beyond a reasonable doubt that Durfee in fact committed the crimes of which he was accused.

**D. Sufficiency of the Evidence as to LiCausi's Conviction for Attempted Robbery of the Warner, New Hampshire Market Basket**

■ LiCausi claims that the evidence at trial was insufficient to prove attempted robbery of the Market Basket in Warner, New Hampshire. To prove attempt, the government must establish an intent to commit the substantive offense and a substantial step towards its commission that is more than preparation but less than the last act necessary to commit the crime itself. *See United States v. Chapdelaine*, 989 F.2d 28, 33 (1st Cir.1993) (citing *United States v. Figueroa*, 976 F.2d 1446, 1459 (1st Cir.1992); *United States v. Manley*, 632 F.2d 978, 987 (2d Cir. 1980)). According to LiCausi, the evidence at trial failed to establish the "substantial step." We disagree.

The evidence showed that on April 18, 1996 Subocz and Munroe, their daughter Brianna, and LiCausi were in the Warner area looking for potential robbery targets. The group

saw the Market Basket from the highway and turned off to determine its viability as a target. Munroe and LiCausi went inside, looked over the store, and returned to tell Subocz that its arrangement was similar to that of most other Market Baskets. Subocz and LiCausi decided to rob it. LiCausi then stole a car, which they placed in a McDonald's parking lot right next to the Market Basket. Subocz and LiCausi began observing the store through binoculars, and Subocz set the radio scanner to pick up local police frequencies. At some point, the group drove in Munroe's car to a secluded area not far from the store, where Subocz and LiCausi changed into their robbery clothes, including gloves, and readied their weapons, the shotgun and the Beretta pistol. Then they returned to the McDonald's parking lot and continued to observe the Market Basket. The scanner picked up a radio transmission having something to do with a water treatment center. Concerned that this might mean a greater police presence in the area, they drove back to the area where LiCausi had stolen the car and saw some state troopers there. Unsure whether the police presence was due to the stolen car or the intercepted radio call, the group returned to the McDonald's parking lot. Subocz and LiCausi ultimately abandoned their plan because a group of people in front of the store showed no signs of leaving and because they heard another radio transmission related to the car they had stolen.

We have found the "substantial step" requirement satisfied in similar circumstances. In *Chapdelaine,* for example, the defendant and his associates had " 'cased' the BayBank branch and the armored truck, positioned stolen vehicles for an escape, acquired weapons and disguises, arrived at the scene ready to commit the crime and were frustrated only by an accidental change in the truck's schedule." *Chapdelaine,* 989 F.2d at 33. In another case, the group's conduct "in casing the bank, stealing a car, and arriving armed at the bank shortly before the Wells Fargo truck was to arrive, constituted a 'substantial step' toward the robbery that demonstrated that this [intent to commit the robbery] was no idle whim." *United States v. Del Carmen Ramirez,* 823 F.2d 1, 2 (1st Cir.1987).

The robbers in *Del Carmen Ramirez* were alerted to a police stakeout of the robbery location, tried to put their guns in some tall grass and leave the area on foot, and were subsequently arrested. *See id.* LiCausi's and Subocz's preparations were virtually identical to those in *Del Carmen Ramirez.* The reason for the abandonment, be it impossibility, as in *Chapdelaine,* or fear of capture, as in *Del Carmen Ramirez,* is irrelevant. The only issue is whether the actions Subocz and LiCausi took before abandoning their plans constituted the requisite "substantial step." Given First Circuit precedent, we think it clear that they did.

### E. *Denial of Fogarty's Motion to Sever*

Fogarty claims that his pretrial motion to sever should have been allowed and that, as a result of its denial, he was significantly prejudiced by the admission of evidence relating to several crimes in which he was not involved. We find no error.

The government may join multiple defendants in a single indictment where "at least one count alleges a conspiracy ... and the indictment separately alleges that the appellant committed a substantive offense." *United States v. DeLuca,* 137 F.3d 24, 36 (1st Cir.1998); *see also* Fed.R.Crim.P. 8(d). "The federal courts have long recognized that consolidated trials tend to promote judicial economy, conserve prosecutorial resources, and foster the consistent resolution of factual disputes common to properly joined defendants." *United States v. Josleyn,* 99 F.3d 1182, 1188 (1st Cir.1996).

Where, as here, multiple defendants have been properly joined for trial, a defendant may nevertheless request severance when it appears that he is prejudiced by the joinder. *See* Fed.R.Crim.P. 14. "We reverse the decision to deny a motion for severance only upon a showing of strong prejudice, demonstrating a manifest abuse of discretion that deprived the defendant of a fair trial." *United States v. Nason,* 9 F.3d 155, 158 (1st Cir.1993). The appellants thus bear the burden of proving "prejudice greater than that which necessarily inheres whenever multiple defendants ... are jointly

tried." *United States v. Walker,* 706 F.2d 28, 30 (1st Cir.1983). They must prove "prejudice so pervasive that a miscarriage of justice looms." *United States v. Pierro,* 32 F.3d 611, 615 (1st Cir.1994). This high standard accords with the Supreme Court's instruction that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

We find no abuse of discretion in this case. While the jury did hear extensive testimony relating to several crimes in which Fogarty was not involved, that fact does not, by itself, create sufficient prejudice: "It is well settled that, '[e]ven where large amounts of testimony are irrelevant to one defendant, or where one defendant's involvement in an overall agreement is far less than the involvement of others,' the court of appeals must be 'reluctant to second guess severance denials.'" *United States v. O'Bryant,* 998 F.2d 21, 26 (1st Cir.1993) (quoting *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.1990)).

Moreover, since all three defendants were charged as coconspirators, almost all of the evidence relating to other defendants was relevant to, and therefore independently admissible in, the prosecution's case against Fogarty. As we have said, this circumstance precludes a spillover argument. *See id.; see also United States v. Brandon,* 17 F.3d 409, 440 (1st Cir.1994)(quoting *United States v. Searing,* 984 F.2d 960, 965 (8th Cir.1993) ("In the context of conspiracy, severance will rarely, if ever, be required.")).

Finally, the fact that the jury acquitted Fogarty on two counts indicates that the jury was not prevented from making reliable judgments about guilt or innocence, but was able to weigh the evidence independently against each defendant. *See United States v. Flores–Rivera,* 56 F.3d 319, 326 n. 2 (1st Cir.1995) (finding that acquittals suggested "that the jury was able to sift through the evidence in an analytical fashion and that the alleged spillover effect did not cause the jury merely to enter a lump sum conviction");

*Brandon,* 17 F.3d at 440 (finding acquittals to be a relevant factor in upholding a district court's denial of a severance). For all of these reasons we affirm the judge's decision to deny Fogarty's motion to sever.

## F. *Hearsay Testimony of Laura Watson and Lisa Munroe*

LiCausi claims that certain testimony from two witnesses, Laura Watson and Lori Munroe, was inadmissible hearsay. We find error only in the admission of Munroe's testimony but find insufficient prejudice to warrant a new trial for LiCausi.

LiCausi challenges, first, the testimony of Watson, an acquaintance of Fournier's, as to certain statements by Fournier after the attempted robbery of the Pic–N–Pay in Portsmouth, New Hampshire. Watson testified that she left work at Bickford's restaurant in Portsmouth at about 11:30 PM. She saw Fournier, who asked for a ride home and for help finding a friend he had lost near the Holiday Inn. Watson was then allowed to testify, over objection, that Fournier's friend's name was "John." When they could not find "John," she drove him to his residence. LiCausi argues that Fournier's statement identifying his friend as "John" was improperly admitted as a statement in furtherance of a conspiracy.

As we discussed earlier, a hearsay statement is admissible against a defendant if the trial court finds that it is more likely than not that (1) the defendant was a coconspirator of the speaker; (2) the conspiracy existed at the time the statement was made; and (3) it was made in furtherance of the conspiracy. *See United States v. Rivera,* 68 F.3d 5, 7 (1st Cir.1995) (citing *United States v. Petrozziello,* 548 F.2d 20, 23 (1st Cir. 1977)). A district court's findings of fact in applying this test must be upheld unless they are clearly erroneous. *See United States v. Fields,* 871 F.2d 188, 193 (1st Cir.1989).

Given our discussion as to the conspiracy counts, *supra,* we have no difficulty accepting the trial court's finding that a conspiracy existed and that both Fournier and LiCausi were members of it. The closer question is whether the trial judge permissi-

bly found that Fournier's statement identifying his "friend" as "John" was in furtherance of the conspiracy. We have observed in the past that "there is no 'talismanic formula for ascertaining when a conspirator's statements are 'in furtherance' of the conspiracy.'" *See id.* at 194 (quoting *United States v. Reyes,* 798 F.2d 380, 384 (10th Cir.1986)). The statement is admissible if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." *United States v. Fahey,* 769 F.2d 829, 838 (1st Cir. 1985). We accept that looking for LiCausi was in furtherance of the conspiracy. To help by identifying him as John may have been of questionable value, but it was presumably so intended. We are not "left with the definite and firm conviction that a mistake has been made." *Mitchell v. United States,* 141 F.3d 8, 17 (1st Cir.1998).

We come to a different conclusion regarding the admissibility of Munroe's testimony as to certain statements by Subocz. Before going to Ohio with Fogarty to rob a supermarket, Subocz told her that he was going away to do a carpet job. Sometime after he returned, he told her that at one point he and Fogarty had been in a supermarket with a gun but did not attempt a robbery because it did not feel right. Subocz also told Munroe details of what happened during the Saugus Star Market robbery attempt, the Nashua Market Basket robbery, and the Portsmouth Pic–N–Pay robbery attempt. These statements cannot fairly be considered in furtherance of the conspiracy. All but one were made after the crimes they described took place, and they do not appear to have yielded significant enough information to constitute reports to a coconspirator, assuming Munroe could be considered as such. Rather, they appear to us to be instances where Subocz was merely blowing off steam or venting anxiety. Subocz's lie about his trip to Ohio is a closer call, but we think that it is more appropriately characterized as made simply to avoid an argument with his girlfriend. Thus, we think the statements were not made to advance the conspiracy and were inadmissible.

While these statements may have been improperly admitted, we do not think they worked such prejudice that a new trial is necessary. The testimony was cumulative and the weight of the additional evidence overwhelming. That additional evidence pointed to LiCausi's deep involvement in the conspiracy and the individual crimes that Subocz discussed with Munroe. The government elicited extensive testimony on those topics, some of which was corroborated by toll records and other evidence. Accordingly, we think it highly probable that the error in admitting Lori Munroe's hearsay testimony did not contribute to the verdicts. *See United States v. Rose,* 104 F.3d 1408, 1414 (1st Cir.1997). The error therefore need not concern us.

### G. *Admissibility of Special Agent Mulvaney's Testimony*

Durfee claims that the trial court erroneously allowed FBI Special Agent John Mulvaney to testify regarding a telephone call, charged to Munroe's account, made on January 2, 1996 to that number. Based on investigation he conducted on April 9, 1997, Agent Mulvaney testified that the number from which the call was made was that of a pay phone located at the Vista Foods supermarket in Manchester, New Hampshire. According to other testimony, Subocz and Durfee attempted to rob that supermarket on January 3, the day after the call was made. Durfee argues that Agent Mulvaney's testimony was erroneously admitted because disclosure of Agent Mulvaney's report after Subocz had testified regarding the Vista Foods robbery attempt deprived defense counsel of the opportunity to cross examine Subocz regarding the call, because the testimony was irrelevant given Subocz's testimony that no advance planning occurred before the attempt, and because the evidence was more prejudicial than probative. We reject all three contentions.

First, we see no prejudice in the disclosure of the projected testimony after Subocz had testified. Durfee apparently had the phone records and an investigator and could have made his own investigation had he deemed it necessary. In addition, he had no right to the results of Agent Mulvaney's investigation under the Federal Rules

of Criminal Procedure, *see* Fed.R.Crim.P. 16(2) (including as information not subject to disclosure "reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case"), nor was the information *Brady* or Jencks Act material. Absent a special right to disclosure of information, the trial lawyer must make judgments about what information is significant and what information is not. Then, based on those judgments, he must prepare to meet what he thinks opposing counsel will present as evidence. When the lawyer miscalculates, he risks being caught unprepared. That is apparently what happened here, and we will not recast defense counsel's tactical decision (or oversight, perhaps) into a trial error.

Moreover, the trial judge invited defense counsel to recall Subocz if he wished, but defense counsel failed to do so. He contended during oral argument that, assuming the nondisclosure was improper, this remedy was inadequate because later cross examination would be less effective. But the opportunity was there, and, given this and all of the circumstances, we fail to see how Durfee's due process rights have been violated.

■ Durfee's second argument, that the results of Agent Mulvaney's investigation were irrelevant, fares no better. The test for relevance is, of course, whether the piece of evidence sought to be introduced has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. The occurrence of a phone call from the Vista Foods parking lot charged to Subocz's telephone account and made to Durfee's residence clearly is circumstantial evidence tending to make it more probable that Subocz cased the supermarket, that he told Durfee it was a good robbery target, and that the two ultimately robbed it. Subocz's testimony that they committed this robbery with no planning, radios, lookout, safe car, or drop car does not change matters. It does not follow automatically from that acknowledgment that Subocz and Durfee were simply walking by the store and decided without

prior discussion to rob it. While the pair did not make the same preparations that became standard operating procedure in other robberies, testimony did establish that Subocz did case the store and tell Durfee about it. In light of this evidence we think that testimony as to the location of the number listed in the toll records was most certainly relevant.

■ Nor do we believe that the testimony was more prejudicial than probative. *See* Fed.R.Evid. 403. We review such a claim only for abuse of discretion, *United States v. Cruz–Kuilan,* 75 F.3d 59, 61 (1st Cir.1996), and find none here. Durfee argues that the government created an unfair inference as to the call's content and significance by merely presenting evidence of the call and failing to question Subocz as to its contents. However, the evidence of the call was circumstantial evidence of Durfee's participation in the robbery, evidence upon which the jury was entitled to rely in determining Durfee's guilt. Such evidence is, of course, always prejudicial to the defense, and we do not think that the government's failure to question Subocz regarding the phone call, whether by oversight or by design, made Agent Mulvaney's testimony unfairly prejudicial such that Rule 403 mandated exclusion.

### H. Admissibility of Matthew O'Brien's Testimony

■ LiCausi claims that the trial judge erred in admitting as the government's rebuttal evidence the testimony of Matthew O'Brien. O'Brien testified that he had seen Fogarty and LiCausi at the Hillsborough County Jail while he was awaiting sentencing for an unrelated offense. Fogarty and LiCausi, who were being held pretrial, asked him to tell Fogarty's lawyer that Fournier told him that Fournier's brother and Subocz's brother, not LiCausi and Fogarty, had been involved with Subocz and Fournier in the armed robberies. LiCausi claims here that the evidence was not proper rebuttal and was so inflammatory that allowing its admission at such a late stage of the case amounted to an abuse of discretion. We disagree.

"Rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof." *United States v. Laboy*, 909 F.2d 581, 588 (1st Cir.1990). The fact that testimony would have been more appropriately offered during the proponent's case-in-chief does not preclude its admission as rebuttal evidence. *See United States v. Clotida*, 892 F.2d 1098, 1107 (1st Cir.1989) (citing *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir.1980)). Rather, the decisions as to what constitutes proper rebuttal evidence and the order in which the parties present their evidence lie within the sound discretion of the trial judge and are subject to substantial deference. *See id.; United States v. Thuna*, 786 F.2d 437, 444 (1st Cir.1986).

In this case, Subocz testified in great detail regarding the attempted robbery of the Saugus Star Market in the early morning hours of February 2, 1996 and the events of the evening before. He also testified in detail regarding the robbery of the Nashua Market Basket that evening. He named LiCausi as a participant in both incidents. Munroe also testified that LiCausi was with Subocz the night and early morning of the Star Market attempt. Fournier also testified as to LiCausi's involvement in the two incidents.

In his defense, LiCausi called several alibi witness who testified that LiCausi was out with friends almost all night on February 1 and arrived at his sister's house between 5:30 and 6:00 PM on the evening of February 2 to babysit her children. Accepting this testimony over that of Subocz, Munroe, and Fournier would mean that LiCausi could not have participated in the Star Market attempt or the Market Basket robbery.

We note first that Matthew O'Brien's testimony had no particular connection to any defense witness, and therefore as a practical matter could not be offered during cross examination. As such, the evidence could have been offered only during the government's case-in-chief or as rebuttal. The potential admissibility during the case-in-chief is not controlling, of course, and we find no abuse of discretion as to its admission on rebuttal. Matthew O'Brien's testimony, while not directly contradicting the testimony of LiCausi's alibi witnesses, certainly tended to disprove or refute their testimony by undermining its credibility. Given these facts, we do not think that the trial judge abused his broad discretion in allowing O'Brien to testify.

## I. *The Restitution Order as to Durfee*

Finally, Durfee argues that the district court erred in ordering restitution in the amount of $85,385.35 without properly considering his financial resources. We review restitution orders for abuse of discretion, *see United States v. Newman*, 49 F.3d 1, 10 (1st Cir.1995), and find none here.

We have repeatedly pointed out that the provision addressing restitution, 18 U.S.C. § 3664(a) (1994),[4] does not require an explicit finding that the defendant has the ability to pay the restitution ordered. Rather, "it is sufficient if the record on appeal reveals that the judge made implicit findings or otherwise adequately evinced his consideration of those factors." *Newman*, 49 F.3d at 10. Here, the record reveals just that. First, the court explicitly adopted the factual findings of the presentence investigation report, which included information relating to Durfee's financial condition, earning ability, and ability to pay.

Second, the court recognized the possibility that Durfee's financial prospects might improve. As this court has held, "there is no requirement that the defendant be found able to pay now." *United States v. Lombardi*, 5 F.3d 568, 573 (1st Cir.1993); *see also*

4. The analysis would, of course, be simpler under the most recent version of § 3664, which states that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and *without consideration of the economic circumstances of the defendant.*" 18 U.S.C. § 3664(f)(1)(A) (Supp. II 1996) (emphasis added). We analyze the issue under the older version since the defendants committed nearly all of their crimes before the amendment became effective on April 24, 1996. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132 § 211, 110 Stat. 1214, 1241. We do so, however, only to illustrate that the result is the same under either version, and thereby to allay any ex post facto clause concerns.

*United States v. Vaknin,* 112 F.3d 579, 592 (1st Cir.1997) ("A defendant's impoverishment today is no assurance of future poverty, and, hence, present impecuniousness is not a bar to the imposition of restitution."); *Newman,* 49 F.3d at 10. Accordingly, "[a] sentencing court permissibly may take into account a defendant's earning capacity and the prospect that his fortunes will improve." *Vaknin,* 112 F.3d at 592. Here, the court refused to speculate on Durfee's inability to pay after his release, thereby acknowledging the possibility that Durfee's fortunes might improve. Thus, we think this record shows that the trial judge adequately considered Durfee's financial situation and did not abuse his discretion in arriving at a restitution amount.

## III. CONCLUSION

Despite the defendants' valiant efforts at finding error compelling us to reverse, careful analysis of the issues presented leads us to conclude that neither a new trial nor re-sentencing is warranted. The defendants' convictions and sentences are therefore affirmed.