# United States Court of Appeals
## For the First Circuit

No. 03-2608

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID TURNER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Circuit Judge,
Siler,* Senior Circuit Judge,
and Howard, Circuit Judge.

Robert M. Goldstein with whom Martin G. Weinberg, was on brief, for appellant.
John-Alex Romano, Department of Justice, with whom Michael J. Sullivan, United States Attorney, James F. Lang, Assistant United States Attorney, and Joseph F. Palmer, Attorney, Appellate Section, Criminal Division, Department of Justice, were on brief, for appellee.

August 31, 2007

---

*Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Defendant David Turner and three codefendants were convicted of several Hobbs Act and firearms offenses based upon their attempt to rob an armored car facility. Turner appeals his conviction and sentence.

**I.**

We recount the facts in the light most favorable to the verdict, see United States v. Isler, 429 F.3d 19, 22 (1st Cir. 2005), reserving a discussion of additional facts for our analysis.

Turner and his fellow conspirators Carmello Merlino (Merlino), Stephen Rosetti, and William Merlino were arrested on February 7, 1999, as they converged upon their designated rallying point -- TRC Auto Electric (TRC).  From there, the conspirators had intended to go to the Loomis Fargo armored car facility in Easton, Massachusetts and rob it of over $50 million.  To carry out this plan, the conspirators had acquired an arsenal of several handguns, an assault rifle, and a hand grenade, as well as masks, bullet proof vests, police scanners, a radio frequency detector, large duffle bags for the money, and vehicles that they intended to use during the robbery and subsequent escape.  The planned heist was an FBI sting, however, and a purported fifth coconspirator, Anthony Romano, was an FBI informant who had worn a wire during the planning of the robbery.

At trial, Turner claimed entrapment based upon the FBI's tactics in conducting the sting.  His claim focused upon two FBI

-2-

agents, David Nadolski and William Cronin, and Romano.  Turner asserted that the FBI agents induced him to participate in the crime so that they could pressure him to provide information regarding the 1990 robbery of the Isabella Stewart Gardener Museum in Boston, about which they thought he had knowledge.[1]

In 1996, Romano, then incarcerated, had contacted Nadolski and provided information regarding the robbery of the John Quincy Adams Library that led to the conviction of the perpetrator and the recovery of stolen rare books.  Romano remained in periodic contact with Nadolski thereafter.  In October 1997, Romano was released from prison and obtained employment at TRC from his friend, Merlino.  Romano then contacted Nadolski with two pieces of information: (1) that Romano believed that Merlino and his associate, Turner, had been involved in the Gardener robbery; and (2) that Merlino was planning to rob the Loomis Fargo facility. Nadolski informed Cronin, who already believed that Merlino and Turner (who was believed to be a member of Merlino's crew) were somehow involved in the Gardener robbery.  Romano was told to "keep his ears open."  Cronin ultimately met with Merlino three times between January and late April 1998, to negotiate for the return of the paintings.  The negotiations ended after the third meeting,

_____

[1] The Gardener robbery was one of the largest art thefts in history and resulted in the loss of several priceless paintings. Despite the offer of a $5 million reward, the thieves have not been apprehended nor have the paintings been recovered.

with Cronin expressing frustration that Merlino could not return the paintings and would not voluntarily provide information about them.

Between April and November 1998, Romano continued to provide information about the Gardener robbery and the Loomis Fargo plans -- notably, that Merlino wished Romano to arrange for an insider at Loomis Fargo to provide them with information about the interior of the facility. Nadolski, the case agent on the Loomis Fargo matter, decided to proceed with a sting operation, with an FBI agent acting as the insider. In November, Romano agreed to become a "cooperating witness" for the FBI and to record various conversations. At this time, Romano told Merlino that he had finally procured an "insider." With the assistance of Loomis Fargo's security personnel, the FBI provided Romano with information about the facility and a purported diagram of the interior that he could forward to Merlino. When Romano was directed by Merlino to steal a vehicle and license plates, the FBI provided Romano with them.

Merlino and Romano discussed possible accomplices for the heist, and Merlino suggested Turner, making various comments about Turner's criminal experience. Merlino's initial attempts to contact Turner were unsuccessful, and Romano periodically inquired about Turner's status, even suggesting that William Merlino be sent to look for him. Turner ultimately responded.

Turner and Rosetti joined the conspiracy on January 13, 1999, after Merlino presented his plan to them at a restaurant. Thereafter, matters sped ahead, with the conspirators discussing weapons, tactics, vehicles, the advisability of taking hostages, and the need to evade the police if stopped, as well as engaging in "dry runs" with the insider.[2] They selected February 7, 1999 as the robbery date, agreeing to rendezvous at TRC in the early morning.

Carmello Merlino was arrested upon his arrival; William Merlino was arrested at a nearby gas station after he attempted to enter TRC. Turner and Rosetti arrived at TRC in Rosetti's Honda, and they proceeded to "square the block" -- check for following vehicles and surveil the area for law enforcement personnel. Apparently sensing something was amiss, they left the area and drove to Turner's Chevrolet Tahoe that had been parked in a nearby condominium complex parking lot. There they removed several large duffle bags from the Honda and placed them in the Tahoe. Thereafter, they returned in the Honda to TRC and again began squaring the block. Law enforcement personnel arrested them after a brief chase. A search of the Tahoe revealed weapons, ammunition,

---

[2] The "insider" would be called via a special cell phone, then leave the facility for the parking lot, ostensibly to get something from his car. The conspirators intended to pretend to take the insider hostage with a gun to his head and enter the facility. On these dry runs an undercover FBI agent, acting as the inside man, responded to the calls and went to his car in the parking lot as arranged (while the conspirators observed him from a distance).

masks, bullet proof vests, scanners, a radio frequency detector, the box for the cell phone provided to the insider, and other equipment. A search of TRC revealed the van that was to be used in the heist, which contained other robbery equipment.

Turner was indicted for six offenses: conspiracy to affect commerce by robbery in violation of 18 U.S.C. § 1951 (Hobbs Act) (Count 1), attempt to affect commerce by robbery in violation of 18 U.S.C. § 1951 (Count 2), carrying a firearm (grenade) in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count 3), carrying a firearm (handguns and an assault rifle) in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count 4), being a felon in possession of a firearm (grenade) in violation of 18 U.S.C. § 922(g)(1) (Count 5), and being a felon in possession of a firearm (handguns and an assault rifle) in violation of 18 U.S.C. § 922(g)(1) (Count 6).

All defendants were tried together.[3] In addition to the tapes and physical evidence, the government presented the testimony of Romano, Nadolski, and a host of other agents who had participated in the sting. The government also presented a stipulation that Turner was a convicted felon.

Turner's defense presented a theory of "vicarious entrapment" -- that the FBI, through Romano, coerced an unsuspecting third party (Merlino) into inducing Turner to join the

_____

[3] Their motion to continue the trial in light of the September 11, 2001 terrorist attacks upon the United States was denied.

-6-

conspiracy so that the FBI could use the prosecution as leverage on Turner to cooperate in the Gardener robbery investigation. Turner called FBI special agent Cronin as his only witness. Cronin acknowledged that he was provided information by Romano about the Gardener robbery throughout the conspiracy, and that he believed Turner would be more likely to cooperate if he were facing serious criminal charges. He also acknowledged that he visited both Turner and Merlino immediately after their arrest in hopes that they would provide information about the Gardner robbery in exchange for possible assistance in this case.[4] But he claimed that his interest had been primarily in Merlino, not Turner, and that his interest in both diminished after April 1998 because he concluded that they could not facilitate the return of the Gardener paintings. To rebut Turner's entrapment theory, the government presented evidence that Turner had been convicted in 1989 and 1990 of two firearm offenses and one larceny/breaking and entering offense, which the government used to argue that he was predisposed to commit the instant offense. Although the court gave an entrapment instruction, the jury found Turner guilty on all counts.

Between conviction and sentencing, Turner filed a motion for a new trial pursuant to Fed. R. Crim. P. 33. Turner argued that a new trial was warranted due to the government's improper failure to produce significant exculpatory evidence, in violation

---

[4] Nadolski provided similar testimony on cross-examination during the government's case-in-chief.

of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).  The evidence consisted of several FBI investigative reports (302s) regarding a second FBI informant who had provided information about Merlino's and Turner's possible involvement in the Gardener robbery.[5]  Turner argued that the 302s would have constituted powerful evidence supporting his entrapment defense and would have eviscerated Cronin's testimony that he had a reduced interest in Merlino and Turner after April 1998.  The district court denied the motion and sentenced Turner to 460 months' imprisonment.

## II.

Turner raises several challenges to his conviction and sentence, including:  (A.) a Hobbs Act conspiracy is not a "crime of violence" for purposes of 18 U.S.C. § 924; (B.) the evidence was insufficient to support a conviction for attempted robbery under the Hobbs Act; (C.) the district court improperly instructed the jury on the elements of vicarious entrapment and the necessary impact on interstate commerce for a Hobbs Act violation; (D.) the court erred in admitting Merlino's taped statements regarding Turner's criminal past; (E.) the court erred in admitting evidence of Turner's prior convictions and the radio frequency detector; (F.) the court erred in denying Turner's motion to sever his trial from Merlino's and to sever the felon-in-possession counts from the

---

[5] Turner's motion was also based upon certain other law enforcement reports, but his presentation here focuses on the 302s related to the second informant.

rest of the charges; (G.) the court erred in denying his motion for a new trial; (H.) Turner was entitled to a sentence reduction for acceptance of responsibility; and (I.) Turner is entitled to remand for resentencing pursuant to United States v. Booker, 543 U.S. 220 (2005).[6]  Concluding that none of these challenges succeed, we affirm Turner's conviction and sentence.

## A.  Hobbs Act Conspiracy as Crime of Violence

Turner argues that he is entitled to a judgment of acquittal on the Section 924(c) counts because conspiracy under the Hobbs Act is not a predicate "crime of violence."[7]  Turner reasons that, because an overt act is not required for a conspiracy conviction under the Hobbs Act, the crime is complete with the making of the agreement (which is not a violent act).  Turner

---

[6] Turner raises certain other challenges that do not warrant significant discussion.  First, he argues that the trial should have been postponed based upon the terrorist attacks upon the United States on September 11, 2001.  This contention fails as this case did not concern terrorism and Turner presents no basis for believing that the denial of a continuance in any way prejudiced him.  Second, he argues that he should have been permitted to question Nadolski about his knowledge of the penalty for possession of a grenade.  This contention also fails, as Turner presents no coherent claim of sentencing entrapment and the evidence made it clear that Merlino (rather than Nadolski through Romano) brought up the matter of grenades.

[7] Section 924(c) provides an enhanced penalty for anyone who uses or carries a firearm in relation to a "crime of violence."  "Crime of violence" is defined as "an offense that is a felony and -- (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its very nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. § 924(c)(3).

relies upon <u>Leocal</u> v. <u>Ashcroft</u>, 543 U.S. 1 (2004) and <u>United States</u> v. <u>King</u>, 979 F.2d 801 (10th Cir. 1992), in pressing this claim.

We review questions of statutory interpretation de novo. <u>See</u> <u>United States</u> v. <u>Frechette</u>, 456 F.3d 1, 7 (1st Cir. 2006). The overwhelming weight of authority holds that a Hobbs Act conspiracy is a "crime of violence" for purposes of Section 924(c). <u>See</u> <u>United States</u> v. <u>Taylor</u>, 176 F.3d 331, 337-38 (6th Cir. 1999); <u>United States</u> v. <u>Phan</u>, 121 F.3d 149, 152-53 (4th Cir. 1997); <u>United States</u> v. <u>Elder</u>, 88 F.3d 127, 129 (2d Cir. 1996); <u>United States</u> v. <u>Mendez</u>, 992 F.2d 1488, 1491 (9th Cir. 1992). These courts reason:

> A conspiracy, by its very nature, is a collective criminal effort where a common goal unites two or more criminals. Such a meeting of the minds enhances the likelihood that the planned crime will be carried out. Thus, when a conspiracy exists to commit a crime of violence,. . . the conspiracy itself poses a substantial risk of violence, which qualifies it under Section 924(c)(1) and Section 924 (c)(3)(B) as a crime of violence.

<u>Elder</u>, 88 F.3d at 129 (internal citation and quotation omitted). This authority is consistent with our rationale for concluding that a conspiracy to commit a crime of violence is a crime of violence under the Bail Reform Act (which is worded identically to Section 924(c)). <u>See</u> <u>United States</u> v. <u>Mitchell</u>, 23 F.3d 1, 3 (1st Cir. 1994)(collecting cases reaching same result under the criminal code). The absence of an overt act requirement does not alter our view. <u>See</u> <u>United States</u> v. <u>Fiore</u>, 983 F.2d 1, 4 n.4 (1st Cir.

-10-

1992)(state conspiracy offense was "crime of violence" for purposes of career offender guideline, even though no act was required); cf. United States v. McKenney, 450 F.3d 39, 45 (1st Cir.), cert. denied, 127 S. Ct. 537 (2006)(drug conspiracy as predicate offense under Armed Career Criminal Act). Indeed, in Fiore, we stated that the key inquiry in assessing the nature of a conspiracy is to ask "conspiracy to do what?" -- as the object of the conspiracy is the critical determinant of its nature. Id. at 3.

Turner counters that this authority has been undermined by the Supreme Court's decision in Leocal. In that case the Court concluded that the offense of driving while intoxicated which causes serious bodily injury (under Florida law) was not a "crime of violence" (as defined in 18 U.S.C. § 16). 543 U.S. at 10-13. Leocal is inapposite for at least two reasons. First, the Court's rationale was that the Florida statute criminalized conduct that was merely accidental or negligent and thus not inherently "violent." Id. at 8-10 (noting that 18 U.S.C. § 16 has higher mens rea requirement). This is not the case with a Hobbs Act violation. Second, the Court was not dealing with inchoate offenses. Id. at 8-9 ("We do not here deal with an attempted or threatened use of force."). Leocal thus has not undermined the conclusion that a conspiracy may qualify as a crime of violence.

Turner also contends that the Tenth Circuit's decision in King properly acknowledges the significance of the absence of an

-11-

overt act requirement in a parallel context.  In <u>King</u>, 979 F.2d at 803.  The Tenth Circuit concluded that conspiracy under New Mexico law, which did not require proof of an overt act, was not a crime of violence.  The court held that because the crime of conspiracy was complete upon "formation of the intent to commit a felony, and does not require that any action be taken on that intent, the elements of conspiracy to commit a violent felony do not include the threatened use of physical force."  <u>Id.</u>

We are unpersuaded by <u>King</u>, which, aside from being at odds with our authority and the great weight of authority from other circuits, does not consider the importance of the object of the conspiracy, which under our case law is a critical inquiry. See <u>Fiore</u>, 983 F.2d at 3.[8]  We conclude that conspiracy under the Hobbs Act constitutes a "crime of violence" for purposes of 18 U.S.C. § 924(c).

### B.  Sufficiency of the Evidence of Attempted Robbery

Turner next argues that the evidence does not support a conviction for attempted robbery.  He maintains that, at the time of the arrest, his actions could at best be characterized as "mere preparation" because he was far from the designated target, Loomis

---

[8] We note that the Tenth Circuit has more recently moved toward the majority position.  In <u>United States</u> v. <u>Brown</u>, the court observed that, despite the fact that conspiracy punishes the agreement rather than the substantive offense, "at minimum, an agreement to accomplish the statutory elements of [a violent felony] necessarily involves a substantial risk of physical force against the person or property of the victim."  200 F.3d 700, 706 (10th Cir. 1999).

-12-

Fargo, and was driving away from the rallying point when apprehended. To his view, the arrest should have been made after the group arrived at Loomis Fargo or, at the earliest, when they had assembled, prepared, and left TRC in their vehicles.

We assess a challenge to the sufficiency of the evidence by determining whether the evidence, taken in the light most favorable to the government, supports the guilty verdict. United States v. Burgos, 254 F.3d 8, 11 (1st Cir. 2001). "To prove attempt, the government must establish both an intent to commit the substantive offense and a substantial step towards its commission." Id. at 12 (internal citation omitted). While "mere preparation" does not constitute a substantial step, a defendant "does not have to get very far along the line toward ultimate commission of the object crime in order to commit the attempt offense." United States v. Doyon, 194 F.3d 207, 211 (1st Cir. 1999).

Under this standard, the evidence was sufficient to support the verdict. Turner and his compatriots planned the offense in great detail, assembled weapons and other robbery equipment, prepared vehicles, surveiled the target, practiced dry-runs, and gathered at the designated assembly point on the day scheduled for the robbery. No more is required. See generally United States v. LiCausi, 167 F.3d 36, 48 (1st Cir. 1999); United States v. Chapdelaine, 989 F.2d 28, 30-33 (1st Cir. 1993). Indeed, the facts in both LiCausi and Chapdelaine are strikingly similar to

-13-

the conduct of Turner and his cohorts in this case. The LiCausi and Chapdelaine defendants surveiled the target, assembled weapons, utilized disguises/robbery clothes, stole and positioned vehicles for use in the robbery and subsequent escape, and used a radio scanner to monitor police activity. See id. As in each of those cases, the evidence here suffices to support a conviction for attempted armed robbery. Moreover, there is no requirement that the actions constituting the attempt have a particular geographic proximity to the object of the substantive offense. See generally Doyon, 194 F.3d at 212 (drug dealer's payment of past drug debt to supplier constituted a substantial step in his attempt to make a future narcotics purchase). And the fact that Turner may have detected the FBI's surveillance and tried to abandon the attempt at the last moment is irrelevant. See LiCausi, 167 F.3d at 48 (that defendants abandoned the attempt after seeing a large number of people in front of the target and intercepting a police call on a radio scanner was inconsequential as they had already taken a substantial step toward the robbery); United States v. Del Carmen Ramirez, 823 F.2d 1, 1-2 (1st Cir. 1987)(that defendants hid guns in grass and attempted to leave area when they spotted police is irrelevant because defendants had already completed a substantial step).[9]

---

[9] We note a final flaw with Turner's position. In light of the defendants' formidable arsenal and stated intent to "have it out" with the police, waiting to make the arrest until the defendants left TRC (with bullet proof vests on and weapons at ready) or

-14-

### C.  Jury Instructions

Turner raises two challenges to the jury instructions. He first argues that the instructions were inadequate in their description of the required impact on interstate commerce necessary for a Hobbs Act conviction.  Turner posits that the Supreme Court, in United States v. Lopez, 514 U.S. 549 (1995), raised the impact on interstate commerce required under the Hobbs Act from "any impact" to a "substantial impact."  Further, Turner asserts that the factual impossibility of the robbery forecloses as a matter of law the possibility that his crime had a substantial impact on interstate commerce.  He also argues that the court erred in instructing the jury regarding the vicarious entrapment defense. Turner says that the court should not have told the jury that the government agent must "specifically target" the defendant and "specifically instruct" the intermediary to pressure the defendant.

In assessing a challenge to jury instructions, our task is to determine if the instructions, taken as a whole, fairly and adequately submitted the issues in the case to the jury.  See United States v. Glaum, 356 F.3d 169, 178 (1st Cir. 2004), vacated on other grounds, 543 U.S. 1099 (2005) (Booker).

Turner's first challenge fails.  We have held specifically that Lopez did not change the interstate commerce

---

arrived at Loomis Fargo would have exposed law enforcement personnel and the public to unnecessary risk.

requirement for a Hobbs Act conviction, stating that "the government must show only that the ... conduct created a realistic probability of a de minimis effect on interstate commerce." United States v. Capozzi, 347 F.3d 327, 334-36 (1st Cir. 2003)(internal citation and quotation omitted). The planned theft of over $50 million from a national armored car company more than qualifies. See, e.g., United States v. Jimenez-Torres, 435 F.3d 3, 7 (1st Cir. 2006). Turner's impossibility contention also fails. "While the substantive crime that is the object of the conspiracy may be impossible to achieve, the conspiracy nonetheless qualifies as an offense for which a person may be prosecuted" under federal law. United States v. Sanchez-Berrios, 424 F.3d 65, 78 (1st Cir. 2005)(government sting operation); see also United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)("All that matters is that [defendant] entered a conspiracy whose objective was to steal the assets of an entity in interstate commerce. That the conspiracy failed to accomplish such objective is irrelevant.").

We also reject Turner's challenge to the "vicarious entrapment instruction." The district court's instruction stated:

> Inducement by a codefendant constitutes some vicarious entrapment by the government if the following three elements are met:
> First, that a government agent specifically identified the defendant as the desired target of the inducement or pressure;
> second, that the government agent encouraged the codefendant to induce or pressure the defendant to commit the crime, or his government agent's handlers condoned the

-16-

use of coercive inducements or pressure by the codefendant; and
third, the codefendant, in fact, applied pressure or an improper inducement to overcome the defendant's reluctance to become involved.

Turner's claim that the second part of the instruction included a requisite that the government agent must "specifically instruct" the codefendant to induce the defendant to participate in the crime is baseless. The instruction explicitly allows for situations where the codefendant, on his own, coerces the defendant into joining the criminal enterprise, and the government merely condones the action. This instruction is consistent with our case law on the third-party entrapment defense. See United States v. Luisi, 482 F3d. 43, 54-56 (1st Cir. 2007) United States v. Rogers, 102 F.3d 641, 645 (1st Cir. 1996); United States v. Bradley, 820 F.2d 3, 7-8 (1st Cir. 1987).

Turner's alternative claim, that the instruction improperly informed the jury that the government agent must initially "target" the defendant may have more traction, as such a requirement does not explicitly appear in Luisi, Rogers or Bradley, and it makes the defense somewhat harder for a defendant to establish. But even if there was error, and we are not saying that there was, the error was harmless. To prevail on an entrapment claim, the defendant must show that he was improperly induced by the government to engage in criminal conduct and that he was not

predisposed to engage in the conduct. Sanchez-Berrios, 424 F.3d at 76. Improper inducement consists of more than providing an opportunity to a commit a crime; the inducement must create "a risk of causing an otherwise unwilling person to commit the crime." United States v. Walter, 434 F.3d 30, 36 (1st Cir. 2006)(internal citation and quotation omitted). The something "more" generally consists of excessive pressure by the government agent on the defendant or the exploitation of a defendant's noncriminal motive, for example, sympathy. Id. Failure to establish either improper inducement or lack of predisposition defeats the defense. Id. at 35-36.

The evidence is strong that there was no improper inducement and that Turner was predisposed to commit the crime. Despite making several phone calls and pages to Turner, Merlino made it clear that he was making an offer to participate which Turner could readily decline. There was no hint of threats or any other undue pressure -- simply the opportunity for a big score. See Sanchez-Berrios, 424 F.3d at 76-77 (neither mere solicitation nor the prospect of illicit gain constitutes improper inducement). Moreover, Turner's own statements, either on tape or attributed to him by Romano, and conduct clearly paint him as an experienced criminal and an eager participant. Turner engaged in additional surveillance of the target, ran an additional dry run with the "insider," stated that the group should shoot it out with police if

stopped, expressed concern that his Tahoe was bugged, commiserated with Rosetti about the intense impatience one feels while waiting to begin a planned robbery, and expressed concern that he and Merlino should not be seen together because people know that when they are together something illegal is going to happen. See generally Walter, 434 F.3d at 37 (predisposition may be inferred from the defendant's statements showing experience with criminal activity). On this record, Turner's entrapment defense could not prevail.

### D. Merlino's Statements

Turner raises three challenges to the admission of Carmello Merlino's taped statements about Turner's criminal past: that his entrapment defense was fatally prejudiced by the admission of the statements, that the admission of Merlino's statements constituted error under Bruton v. United States, 391 U.S. 123 (1968), and that admission of the statements violated his right of confrontation under Crawford v. Washington, 541 U.S. 36 (2004).

We begin with common ground. Both sides agree that the statements are admissible against Merlino. Further, both sides agree that statements in furtherance of the conspiracy, made by Merlino after Turner joined the conspiracy, are admissible against Turner. See generally LiCausi, 167 F.3d at 46. At issue are statements made by Merlino before the January 13, 1999 meeting, which the jury could understand to mean that Turner was proficient

with firearms (e.g., "good with these"), could obtain them (e.g., "they got one or two"), and had participated in other robberies (e.g., "knows how to do these").

Again here, any error with respect to the entrapment defense was harmless. "The admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict." Isler, 429 F.3d at 26 (internal citation omitted). Factors to consider in this calculus include the importance of the evidence, its uniqueness, how it was used, and the relative strength of the opposing case. Id.

In our view, the statements in question were merely cumulative, as Merlino made nearly identical comments about Turner after January 13th. Moreover, as we have noted, Turner's own comments were to the same effect. Finally, as we have also noted, the evidence that Turner was not entrapped was strong, and the pre-January 13th comments were not emphasized by the government in its argument.

The Sixth Amendment challenges are also flawed. Merlino's statements implying past criminal behavior on Turner's part did not directly implicate Turner in the charged conspiracy. Therefore, the admission of the statements could not constitute Bruton error. See United States v. Smith, 46 F.3d 1223, 1227-28 (1st Cir. 1995) (no Bruton error where the codefendant's statement does not expressly implicate the defendant). Similarly, there is

no Crawford error, as Merlino's secretly recorded statements were not "testimonial," within the meaning of Crawford. See generally United States v. Brito, 427 F.3d 53, 58-59 (1st Cir. 2005); see also Horton v. Allen, 370 F.3d 75, 83-85 (1st Cir. 2004) (conspirator's statement to witness during private conversation was not testimonial).

### E. Other Evidentiary Claims

Turner raises two other challenges to the district court's evidentiary rulings. First, he argues that the court erred in admitting evidence of two prior convictions that were remote in time and of dubious relevance. Second, he contends that the court erred in admitting evidence of the radio frequency detector[10] found in his vehicle, which Turner maintains served no function other than to prejudice the jury. We review a district court's evidentiary rulings for abuse of discretion. United States v. Mercado Irizarry, 404 F.3d 497, 500 (1st Cir. 2005). There was no abuse of discretion.

The prior convictions were highly probative to rebut Turner's entrapment defense and not too remote in time. See United States v. Van Horn, 277 F.3d 48, 57-58 (1st Cir. 2002). Moreover, given the nature of the conspiracy and Turner's role in providing the firearms, the prior convictions were clearly relevant.

---

[10] A radio frequency detector is a device for detecting hidden listening devices.

Similarly, the radio frequency detector was probative of the sophisticated nature of the conspiracy and, thus, the merits of the entrapment defense. Moreover, the admission of the radio frequency detector is no more prejudicial than the admission of the police scanners, which Turner does not challenge.

### F. Severance

Turner next argues that the district court erred in refusing to sever his felon-in-possession counts and in failing to sever his trial from Merlino's. As to the former, Turner asserts that the felon-in-possession counts prejudiced his entrapment defense. As to the latter, Turner argues that a severance was necessary to obtain Merlino's testimony that (1) Romano raised Turner's name and pressured Merlino to recruit him, (2) Turner initially rejected Merlino's overtures and Merlino continued to apply pressure on him, and (3) Turner had received Merlino's repeated pages and telephone messages.

We begin with the refusal to sever felon-in-possession counts, assessing the district court's ruling for manifest abuse of discretion. See Burgos, 254 F.3d at 13. To prevail on this claim, Turner must show that the "improper joinder likely deprived him of a fair trial." Id. at 14 (internal citation and quotation omitted).

There was no abuse of discretion in the district court's refusal to sever these counts. The felon-in-possession counts were

properly tried with the other counts because they arose out of the same conduct.  See United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997).   In addition, any possible prejudice was limited by Turner's stipulation to his status as a convicted felon.  See id. Moreover, and in any event, as discussed above, his prior convictions were properly a part of the government's rebuttal of his entrapment defense.  See Van Horn, 277 F.3d at 57-58.

As to the severance of Merlino and Turner's trials, we start by noting that individuals who are indicted together generally should be tried together.  United States v. Pena-Lora, 225 F.3d 17, 33 (1st Cir. 2000). Moreover, severance is particularly disfavored in conspiracy cases.  Id.  To be entitled to severance, the defendant must show "prejudice so pervasive that a miscarriage of justice looms."  LiCausi, 167 F.3d at 49.  To obtain a severance based upon the need for a codefendant's testimony, the defendant must show "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the codefendant will in fact testify if the cases are severed."  Smith, 46 F.3d at 1231.

Under this standard, there was no manifest abuse of discretion in denying the motion.  The proffered testimony was of limited, if any significance to Turner's entrapment defense because

it did not tend to refute the overwhelming evidence of predisposition nor indicate improper inducement.[11]

### G. Motion for a New Trial

Turner argues that he is entitled to a new trial because the government violated its obligations under Brady in improperly suppressing the FBI 302 reports regarding a second informant - the so-called "Chicofsky materials." Turner asserts that the suppressed materials would have provided invaluable support for his entrapment defense, and that the evidence would have enabled him to impeach Cronin's testimony that his interest in Merlino and Turner waned after April.

Under Brady, the government is required to turn over exculpatory or impeachment evidence in its possession to the defendant. United States v. Rivera-Rangel, 396 F.3d 476, 485 (1st Cir. 2005). A new trial is warranted based upon a Brady violation if the defendant establishes that (1) the evidence is material and favorable to the defense, (2) the prosecution suppressed the evidence, and (3) the defendant was prejudiced because there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. Id. Suppressed evidence that is merely cumulative of evidence already in the defendant's possession does not justify a new trial. Conley

---

[11] Furthermore, any suggestion of improper inducement would be refuted by Merlino's taped statements to the contrary.

v. United States, 415 F.3d 183, 189 (1st Cir. 2005). We review the district court's decision for manifest abuse of discretion. Rivera-Rangel, 396 F.3d at 485-86.

Turner's Brady claim fails because the Chicofsky materials, and related documents, are not nearly as beneficial as Turner claims. All but two of the thirty-eight Chicofsky 302s precede May 1, 1998, and the other two reports did not mention Turner; this is consistent with Cronin's testimony that his belief that Merlino would or could return the paintings waned after April 1998. Further, Turner was mentioned in only five of the 302s, and Merlino's attempts to return the paintings, as recounted in the 302s, focused entirely on other individuals. Moreover, all this evidence was merely cumulative of stronger evidence presented at trial suggestive of the FBI's potential motivation to entrap Turner. Indeed, Cronin's own testimony made it clear that he was in active negotiations with Merlino in April 1998, that he was well aware of Turner's connection to Merlino, that he had received reports from Romano regarding the Gardener robbery throughout the conspiracy, and that he visited Turner on the day of his arrest in a last attempt to secure information regarding the Gardener robbery. Most significantly, Turner's presentation continues to focus on the FBI's potential motive to entrap him, while ignoring the more significant issues of inducement and predisposition. On

those issues, the Chicofsky materials contribute nothing.[12]  There is nothing about the suppressed materials that suggests a reasonable probability of a different result.

**H.  Sentencing**

Finally, Turner raises two issues regarding his sentence. He first claims that he was entitled to a reduction for acceptance of responsibility, claiming that he did not deny the "essential factual elements of guilt" but simply challenged the government's conduct with his entrapment defense.  While it is remotely conceivable, in some rare circumstance, that a defendant who goes to trial with an entrapment defense might still be entitled to such a reduction, Turner's decision to defend himself at trial through a weak claim of entrapment in no way places him in this narrow theoretical category.  See Sanchez-Berrios, 424 F.3d at 79; see also Glaum, 356 F.3d at 180.

Turner next claims that he is entitled to a remand for resentencing under Booker, as he has met the four-part plain error test discussed in United States v. Antonakopoulos, 399 F.3d 68, 78-79 (1st Cir. 2005)(there was error, the error was plain, the error affected substantial rights of the defendant, and the error

---

[12] Turner's other arguments regarding Chicofsky -- that Chicofsky should not have been permitted to invoke the Fifth Amendment at the hearing and that Turner should have been permitted to examine him question by question -- are too perfunctorily presented to merit review.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

undermined the fairness or integrity of the judicial proceedings).

Turner meets the first two parts, because the district court treated the guidelines as mandatory. See Isler, 429 F.3d at 29. However, to satisfy parts three and four, Turner "must show a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new advisory guidelines." See United States v. McLean, 409 F.3d 492, 505 (1st Cir. 2005)(internal citation and quotation omitted). Turner cannot carry this burden. The district court rejected his request to be sentenced at the bottom of the guideline range, and such a refusal "speaks volumes" about the defendant's chances on remand. Id. Moreover, a review of the sentencing materials reveals no indication that the district judge would be inclined to impose a lower sentence. See id.[13]

## III.

For the reasons stated above, Turner's conviction and sentence are **affirmed.**

---

[13] Turner also argues that the district court erred in applying U.S.S.G. § 2X1.1 instead of § 2B3.1, and, alternatively, that the district court erred in failing to grant a reduction under U.S.S.G. § 2X1.1(b)(2). Both of these arguments are presented without authority and in such a perfunctory manner that we deem them waived. See Zannino, 895 F.2d at 17.